IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TOM BROWN and SAMUEL WILSON ,<br><br>                    Plaintiffs,<br><br>      v.<br><br>TAYLOR MADE GOLF COMPANY, INC., and DOES 1-5,<br><br>                    Defendants. | Civil Action No.<br><br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

TOM BROWN and SAMUEL WILSON ("Plaintiffs"), by and through undersigned counsel, seek a permanent injunction requiring a change in TAYLOR MADE GOLF COMPANY, INC.'s ("Defendant") corporate policies to cause its websites, including taylormadegolf.com, taylormadegolfdirect.com, and tmag.biz, to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiffs respectfully assert as follows:

## INTRODUCTION

1.      In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services,

privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.[1]

2.      Plaintiff Tom Brown is legally blind and uses JAWS screen-reader software to navigate the internet.

3.      Plaintiff Samuel Wilson is legally blind and uses a screen-reader to navigate the internet.

4.      At a rapid pace, "the software reads the content of a webpage to the user."

*Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017)* (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id*. at *6-7.[2]

5.      Defendant is a retailer that sells golf clubs, golf apparel, and golf accessories, and also sponsors PGA golf tour members.

---

[1]      *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at https://images.cutimes.com/contrib/content/uploads/documents/413/152136/adaletter.pdf)    (last accessed Oct. 10, 2019).

[2]      *See* American Foundation for the Blind, *Screen Readers*, *available at* https://www.afb.org/node/16207/screen-readers (last accessed October 10, 2019) (discussing screen readers and how they work).

6.      Consumers may purchase Defendant's products and services at Defendant's

Websites, including https://www.taylormadegolf.com, www.taylormadegolfdirect.com, and

www.tmag.biz (collectively, "Website"), the websites Defendant owns, operates, and controls.[3]

7.      In addition to researching and purchasing Defendant's products from the comfort

and convenience of their homes, consumers may also use Defendant's Website to contact

customer service by phone and instant messenger, sign up to receive product updates, product

news, and special promotions, review important legal notices like Defendant's Privacy Policy,

track online orders, and more.[4]

8.      Defendant is responsible for the policies, practices, and procedures concerning the

Website's development and maintenance.

9.      Unfortunately, Defendant denies approximately 8.1 million[5] Americans who have

difficulty seeing access to their Website's goods, content, and services because the Website is

largely incompatible with the screen reader programs these Americans use to navigate an

increasingly ecommerce world.

10.     Plaintiffs bring this civil rights action against Defendant to enforce Title III of the

Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("Title III"), which requires, among

other things, that a public accommodation (1) not deny persons with disabilities the benefits of

its services, facilities, privileges and advantages; (2) provide such persons with benefits that are

---

[3]      Privacy policy, *available at* https://www.taylormadegolf.com/shared-customer-service-customer-legal/privacy.html?lang=default (last accessed October 18, 2019).

[4]      *See, e.g.*, Defendant's home page, *available at* www.taylormadegolf.com (last accessed October 18, 2019).

[5]      Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed Oct. 10, 2019) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—
including electronic services for use with a computer screen reading program—where necessary
to ensure effective communication with individuals with a visual disability, and to ensure that
such persons are not excluded, denied services, segregated or otherwise treated differently than
sighted individuals; and (4) utilize administrative methods, practices, and policies that provide
persons with disabilities equal access to online content.

11.     By failing to make its Website available in a manner compatible with computer
screen reader programs, Defendant, a public accommodations subject to Title III, deprives blind
and visually-impaired individuals the benefits of its online goods, content, and services—all
benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma
among these Americans that Title III was meant to redress.

12.     Because Defendant's Website is not and has never been fully accessible, and
because upon information and belief Defendant does not have, and has never had, adequate
corporate policies that are reasonably calculated to cause its Website to become and remain
accessible, Plaintiffs invoke 42 U.S.C. § 12188(a)(2) and seek a permanent injunction requiring
that:

> a) Defendant retain a qualified consultant acceptable to Plaintiffs ("Web
> Accessibility Consultant") who shall assist in improving the accessibility of its
> Website, including all third-party content and plug-ins, so the goods and services
> on the Website may be equally accessed and enjoyed by individuals with vision
> related disabilities;
>
> b) Defendant work with the Web Accessibility Consultant to ensure all employees
> involved in website and content development be given web accessibility training
> on a biennial basis, including onsite training to create accessible content at the
> design and development stages;
>
> c) Defendant works with the Web Accessibility Consultant to perform an automated
> accessibility audit on a periodic basis to evaluate whether Defendant's Website
> may be equally accessed and enjoyed by individuals with vision related
> disabilities on an ongoing basis;

d) Defendant work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

e) Defendant incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f) Defendant work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Website, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g) Defendant directly link from the footer on each page of its Website, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Website to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Website;

h) Defendant accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i) Defendant provide a notice, prominently and directly linked from the footer on each page of its Website, soliciting feedback from visitors to the Website on how the accessibility of the Website can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j) Defendant provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Website;

k) Defendant train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Website. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l) Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to be inaccessible to users of screen reader technology;

m) Plaintiffs, their counsel, and their experts monitor the Website for up to two years after the Mutually Agreed Upon Consultant validates the Website is free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiffs, through their counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Website Accessibility Consultant provides Defendant.

13.     Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

**JURISDICTION AND VENUE**

14.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

15.     Defendant attempts to, and indeed do so, participate in the Commonwealth's economic life by clearly performing business over the Internet. Through its Website, Defendant enters into contracts for the sale of its products and services with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Access Now Inc. v. Otter Products, LLC, 280 F.Supp.3d 287 (D. Mass. Dec. 4, 2017)* (exercising personal jurisdiction over forum

plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

16.     As described in additional detail below, Plaintiffs were injured when they attempted to access Defendant's Website from their homes, including in this District, but encountered barriers that denied them full and equal access to Defendant's online goods, content, and services.

17.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

18.     Plaintiff Tom Brown is and, at all times relevant hereto, has been a resident of Westmoreland County, Pennsylvania. Plaintiff Samuel Wilson is and, at all times relevant hereto, has been a resident of Amherst, New York. Plaintiffs are and at all times relevant hereto have been legally blind and are therefore members of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

19.     Defendant is a Delaware corporation with its principle place of business at 5545 Fermi Court, Carlsbad, CA 92008.

20.     The true names and capacities, whether individual, corporate, associate, affiliate, parent, subsidiary, or otherwise of the Defendants named herein as Does 1 through 5, are unknown to Plaintiffs at this time. Plaintiffs will amend this Complaint to assert their true name and capacities when known. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously-named Defendants is responsible in some manner for the occurrences alleged in this Complaint.

21.     Plaintiffs assert that Defendants, including Doe Defendants, and each of them at all times mentioned in this Complaint, were the alter egos, agents, and/or employees and/or employers of their Co-Defendants and in doing the things alleged in this Complaint were acting within the course of such agency and/or employment and with the permission and consent of their Co-Defendants.

## FACTS APPLICABLE TO ALL CLAIMS

22.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S ONLINE CONTENT

23.     Defendant's Website allows consumers to research and purchase Defendant's services and products from the comfort and convenience of their own homes.

24.     The Website also enables consumers to contact customer service by phone and instant messenger, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Privacy, track online orders, and more.

25.     Consumers may also use the Website to follow the PGA players Defendant sponsors.

## HARM TO PLAINTIFFS

26.     Plaintiffs attempted to access the Website from their homes. Unfortunately, because of Defendant's failure to build the Website in a matter that is compatible with screen

reader programs, Plaintiffs are unable to understand, and thus are denied the benefit of, much of the content and services they wish to access on the Website. For example:

      a.      Defendant's Website features a submenu that has content that is not accessible via keyboard-only. The submenu list items only function when a mouse is moved over the element and does not provide the functionality to a keyboard-only user to reveal the submenus. Screen-reader users have this same experience since they cannot use a mouse to navigate a website. This creates entire areas of the website that a user who perceives content visually can access, but which blind users cannot access. An example of this can be found on the Website's homepage, demonstrated below:



b.      The buttons on Defendant's Website to adjust the handicap level are not given the proper role. The handicap buttons are skipped when a user is navigating with the tab key. Elements with an action are required and expected to be available via the tab key. Thus, it is unlikely a screen-reader user will know these buttons are available. An example of this can be found on the Website's homepage, demonstrated below:



c.      Defendant's Website features cart confirmation messages which are not available to screen-reader users. When a user adds an item to their cart the visual pop-up, indicating success, is not announced for a screen-reader user nor is it given focus. Thus, a screen-reader user will not know if the item he or she wishes to purchase is in the shopping cart. This is demonstrated below:



27.     These barriers, and others, deny Plaintiffs full and equal access to all of the services the Website offers, and now deter them from attempting to use the Website. Still, Plaintiffs would like to, and intend to, attempt to access the Website in the future to research the products and services the Website offers, or to test the Website for compliance with the ADA.

28.     If the Website was accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiffs could independently research and purchase Defendant's products and access its other online content and services.

29.     Though Defendant may have centralized policies regarding the maintenance and operation of the Website, Defendant has never had a plan or policy that is reasonably calculated to make the Website fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

30.     The law requires that Defendant reasonably accommodate Plaintiffs' disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

31.     Plaintiffs have been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

## DEFENDANT'S KNOWLEDGE OF WEBSITE ACCESSIBILITY REQUIREMENTS

32.     Defendant has long known that sufficient contrast and skip navigation links are necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

33.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

## THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE

34.     There is no DOJ administrative proceeding that could provide Plaintiffs with Title III injunctive relief.

35.     While the DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiffs with relief.

36.     Plaintiffs allege violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

12

37.     Resolution of Plaintiffs' claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services on its Website, and (b) whether Plaintiffs can access the content and services.

## SUBSTANTIVE VIOLATIONS

### COUNT I

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

38.     The assertions contained in the previous paragraphs are incorporated by reference.

39.     Defendant's Website is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

40.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiffs with full and equal access to its Website, it has violated the ADA.

41.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

42.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service or fails to provide a like experience to the disabled person.

43.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

44.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

45.     By failing to provide its Website's content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a)     denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Website;

(b)     affording individuals with visual disabilities access to its Website that is not equal to, or effective as, that afforded others;

(c)     utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

14

(d)     denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)     failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

46.     Defendant has violated Title III by, without limitation, failing to make its Website's services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Website, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

47.     Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Website to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

48.     Making its online goods, content, and services compatible with screen reader programs does not change the content of Defendant's Website or result in making the Website different, but rather enables individuals with visual disabilities to access the Website Defendant already provides.

49.     Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiffs and other individuals with visual disabilities.

50.     Plaintiffs' claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

51.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiffs request relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Website was fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Website is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause them to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiffs is described more fully in paragraph 12 above.

(C)     A permanent injunction enjoining Defendant from continuing their retaliatory and coercive conduct;

(D)     Payment of actual, statutory, and punitive damages, as the Court deems proper;

(E)     Payment of costs of suit;

(F)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the

Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same);

(G)     The provision of whatever other relief the Court deems just, equitable and appropriate; and

(H)     An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: October 24, 2019                    Respectfully Submitted,

*/s/ Benjamin Sweet*
Benjamin J. Sweet
ben@sweetlawpc.com
**THE SWEET LAW FIRM, P.C.**
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Phone: (412) 857-5350

Jonathan D. Miller
jonathan@nshmlaw.com
**NYE, STIRLING, HALE & MILLER, LLP**
33 W. Mission Street, Suite 201
Santa Barbara, CA 93101
Phone: (805) 963-2345

*Attorneys for Plaintiffs, Tom Brown and Samuel Wilson*